IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-155

No. 99A21

Filed 17 December 2021

IN THE MATTER OF: R.G.L.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 23 November 2020 by Judge Benjamin S. Hunter in District Court, Person County. This matter was calendared for argument in the Supreme Court on 13 December 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Thomas L. Fitzgerald for petitioner-appellee Person County Department of Social Services; and Matthew D. Wunsche for appellee Guardian ad Litem.*

*Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent Defender, for respondent-appellant father.*

EARLS, Justice.

Respondent appeals from the trial court's order terminating his parental rights in the minor child "Robert."[1] We affirm.

## I.    Background

On 29 August 2018, the Person County Department of Social Services (DSS) filed a petition alleging that three-year-old Robert was neglected. The juvenile

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

petition stated that a child protective services (CPS) report was filed on 14 May 2018 alleging improper supervision, injurious environment, and substance abuse after Robert wandered away from the house while respondent was sleeping and a neighbor called 911. Respondent and Robert's mother completed requested drug screens on 15 May 2018. Respondent's screens were positive for amphetamines and oxycodone, which he was prescribed, and oxymorphone. He admitted to running out of medication sooner than expected because his use exceeded the prescribed amount. The mother's screens were positive for amphetamines, oxycodone, oxapam, oxymorphone, and marijuana metabolite; moreover, she admitted to using marijuana, Percocet, Adderall, and Valium. The CPS report was substantiated and transferred to in-home services on 27 June 2018.

¶ 3 The juvenile petition further alleged that DSS's efforts to engage the family and ensure Robert's safety were unsuccessful, and that a second CPS report was filed on 27 August 2018 for physical injury after the mother was charged with driving while impaired (DWI) on 19 July 2018 while Robert was in the vehicle. The mother admitted that the DWI charge was the result of her taking suboxone before driving. On 28 August 2018, DSS completed a home visit and found the premises to be in disarray. When the family was unable to identify an alternate safety provider, DSS filed the juvenile petition and obtained nonsecure custody of Robert.

¶ 4 Following a hearing on the juvenile petition on 11 September 2018, the trial

court entered an order on 25 September 2018 adjudicating Robert to be a neglected juvenile. The trial court found that the conditions in the home as alleged in the petition led to or contributed to the adjudication. The court ordered that Robert remain in DSS custody and that DSS develop and implement a visitation plan providing for at least one hour of weekly supervised visitation between Robert and his parents. The court further ordered both parents to submit to random drug screens within two hours of requests to do so and to keep DSS informed of any change of address.

¶ 5    The matter came on for an initial review hearing on 17 December 2018. In the order entered following the hearing, the trial court found that the parents attended an initial child and family team (CFT) meeting to develop their respective case plans on 27 September 2018. Respondent's needs were identified to include employment, parenting skills, substance use, mental health, medical care, and housing. The court further found that respondent was no longer employed as of 23 November 2018; that he completed a mental health assessment in August 2018 that recommended outpatient therapy and a psychiatric evaluation for possible medication management, but he was a "no[-]show" for psychiatric evaluations in September and December 2018; and that the location of the parents' residence was unknown. The court identified the barriers to reunification as the needs identified in the case plan and found that DSS had made recommendations focused on the needs of the parents to

assist the parents in their stated goal of reunification. The court ordered DSS to retain custody of Robert and to maintain a visitation plan allowing the parents at least one hour of weekly supervised visitation and ordered the parents to comply with their case plans, follow recommendations of treatment providers, and submit to random drug screens within two hours of requests.

¶ 6        Following a 26 August 2019 permanency-planning hearing, the trial court entered an order setting the permanent plan for Robert as reunification with a concurrent plan of adoption. The court found that the parents had obtained employment and had made a down payment on a trailer in June 2019. The court noted the parents were working second and third shifts and had not developed a viable plan for childcare, and they did not have drivers' licenses and could not legally transport Robert. The parents' new trailer was found to be clean, neat, and modern, and to have ample space. The court additionally found that respondent attended weekly visitations but was consistently late, fell asleep during most visits, and was not always engaged with Robert during the visits; that respondent had "finally relented" after several months of requests that he seek medical care for sleep apnea, but no report of results had been made; and that the parents reported having had "excellent rapport" with Robert's foster parents and they were "able to eat lunch with [Robert] sometimes and engage him at the church where the foster parents attend." The court ordered DSS to continue the plan of at least one hour of weekly supervised

visitation with additional visitation as arranged with the foster parents and ordered the parents to develop and present transportation and childcare plans to DSS.

¶ 7    The matter came back on for a permanency-planning hearing on 2 December 2019. The trial court found that the parents were struggling to achieve the needed goals. The findings show that both parents had lost their jobs, that respondent reported new employment that had not been verified, and that the parents had not presented suitable transportation or childcare plans to DSS. Respondent attributed his inability to stay awake to his sleep apnea, but he had not sought the requested medical care to address the issue despite DSS's referral to a neurologist for a sleep study. The court also found that individuals who resided with the parents when Robert was removed from the parents' care were still living with the parents, and that DSS was not able to enter the home during the most recent home visit because the parents were asleep and someone else answered the door. The trial court changed the permanent plan for Robert to adoption with a concurrent plan of reunification and reduced the parents' visitation to biweekly supervised visits.

¶ 8    On 5 February 2020, DSS filed a motion to terminate the parents' parental rights in Robert based on grounds of neglect and willful failure to make reasonable progress to correct the conditions that led to Robert's removal from the home. *See* N.C.G.S. § 7B-1111(a)(1), (2) (2019). Respondent filed an answer opposing termination on 12 May 2020.

¶ 9        Before the termination hearing occurred, the matter came back on for two additional permanency planning hearings on 6 July 2020 and 5 October 2020. The updated findings from the 6 July 2020 hearing were unfavorable to the parents. The trial court found that both parents reported unemployment. The court also found that the parents had acquired rental housing different from the trailer they were previously living in; that individuals with extensive criminal and child protective services histories were residing with the parents; and that DSS was advised that the parents "are under eviction status" because of their failure to pay rent since March 2020. The court reduced the parents' visitation to at least one hour of supervised visitation per month. Following the 5 October 2020 hearing, the court found that the parents resided in separate locations, but their accommodations were not stable; the parents reported unemployment; neither parent had visited Robert recently; and neither parent was compliant with the terms of their respective case plans.

¶ 10        The termination motion was heard on 9 November 2020. In an order entered on 23 November 2020, the trial court determined that grounds existed to terminate the parents' parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) and (2) and that termination of the parents' parental rights was in Robert's best interests. Accordingly, the trial court terminated the parents' parental rights in Robert. Respondent appeals.[2]

---

[2] Robert's mother is not a party to this appeal.

## II.  Analysis

¶ 11    Termination of parental rights proceedings are conducted in two stages, an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019).

> In the initial adjudicat[ory] stage, the trial court must determine whether grounds exist pursuant to N.C.G.S. § 7B-1111 to terminate parental rights. If it determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights.

*In re D.L.W.*, 368 N.C. 835, 842 (2016) (cleaned up). In his appeal, respondent challenges the trial court's determinations that grounds existed to terminate his parental rights in Robert at the adjudicatory stage and that termination was in Robert's best interests at the dispositional stage.

### A. Adjudication

¶ 12    At the adjudicatory stage, the petitioner bears the burden of proving the existence of one or more grounds for termination under N.C.G.S. § 7B-1111(a) by "clear, cogent, and convincing evidence." N.C.G.S. § 7B-1109(e), (f) (2019). We review a trial court's adjudication of the existence of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed

conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citing *In re Moore*, 306 N.C. 394, 403–04 (1982)). Unchallenged findings are deemed to be supported by the evidence and are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019) (citing *In re S.N.*, 194 N.C. App. 142, 146 (2008), *aff'd per curiam*, 363 N.C. 368 (2009)).

### 1. *Findings of fact*

In contesting the trial court's adjudication of grounds for termination, respondent raises challenges to the trial court's findings of fact. He first contends that the trial court failed to issue proper and sufficient findings of fact. Respondent argues that "[m]any" of the trial court's findings are "verbatim recitations from the allegations in the termination motion" and that most of the findings are "conclusory" and not sufficiently detailed to permit appellate review. We disagree.

As we have previously explained:

> Our Juvenile Code places a duty on the trial court as the adjudicator of the evidence. It mandates that the court shall take evidence, find the facts, and shall adjudicate the existence or nonexistence of any of the circumstances set forth in G.S. 7B-1111 which authorize the termination of parental rights of the respondent. Section 1A-1, Rule 52(a)(1) of the North Carolina General Statutes provides in pertinent part: In all actions tried upon the facts without a jury the court shall find the facts specially and state separately its conclusions of law. This Court has held:

> While Rule 52(a) does not require a recitation of the
> evidentiary and subsidiary facts required to prove the
> ultimate facts, it does require *specific findings* of the
> ultimate facts established by the evidence, admissions and
> stipulations which are determinative of the questions
> involved in the action and essential to support the
> conclusions of law reached.

*In re T.N.H.*, 372 N.C. 403, 407–08 (2019) (cleaned up).

¶ 15    In the instant case, the trial court determined that grounds existed to terminate respondent's parental rights to Robert pursuant to N.C.G.S. § 7B-1111(a)(1) and (2) as follows:

> 41. . . . . [T]he child is a neglected juvenile and there
> is a probability of neglect will continue for the forseeable
> [sic] future pursuant to the statute because the
> [respondent-]father has not addressed the issues that
> brought the child into care;
>
> . . . .
>
> 43. The [r]espondent[-]father has left his child in
> foster care for in excess of twelve months without showing
> to the satisfaction of the [c]ourt that reasonable progress
> under the circumstances has been made in correcting those
> conditions which led to the removal of the juvenile . . . .

In support of its determination that the statutory grounds existed to terminate respondent's parental rights, the court made the following findings:

> 13. The parents failed to properly supervise their
> child and custody was granted to Person County DSS on
> September 11, 2018; the parents['] excessive and continued
> usage of controlled substances contributed to their lack of
> proper care and supervision of the child;
>
> 14. On September 11, 2018, Person County DSS was

granted custody of this child, and after the parents lost custody, DSS offered services to them to work towards recovering custody of their child;

. . . .

23. The father has not availed himself of any services of DSS social workers to potentially take custody of his minor child;

24. The father has not fully utilized the services offered by DSS;

25. The father has not been willing to work with the DSS social workers to reunify himself with his child;

26. Visitation was offered weekly to the father;

27. That the father's contact with the minor child has been limited to visitations for more than two years;

28. That the father has not provided regular care for his minor child for in excess of two years;

29. The father has not consistently taken steps to become clean and sober;

30. The father has not consistently taken steps to become and remain employed;

31. That the father has not provided any personal care or emotional support for this child during the entire period that the child has been in foster care;

32. That the parents have not attempted to create a bond between themselves and [Robert] since the child came into foster care;

33. DSS entered into a case plan with the parents, showing steps necessary for them to recover custody of their child;

34. The foster care social worker offered services to the [r]espondent parents to achieve such steps, as well as the goal of reunification;

. . . .

36. The [r]espondent[-]father declined services as late as December 2, 2019;

37. That the [r]espondent parents have left this child in foster care for in excess of twenty-five (25) months without showing to the satisfaction of the [c]ourt that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile . . . ;

38. That the actions of each of the [r]espondent parents are willful;

39. That the willfulness of each of the [r]espondent parents continues at this time.

Although the findings closely track the allegations in the termination motion, there are differences between the findings and the allegations, such as the lengths of time and distinctions between parents, that show the trial court did not merely copy the allegations from the termination motion. The modifications indicate the trial court independently reviewed and judged the evidence and issued findings based thereon. Moreover, the findings clearly set forth the trial court's reasoning for its adjudication of grounds to terminate respondent's parental rights based on his failure to engage in services offered by DSS, which resulted in the issues leading to Robert's removal and adjudication going uncorrected. We reject respondent's arguments that the trial court failed to issue proper and specific findings to allow for meaningful

appellate review.

¶ 17        In addition to his general challenges to the findings, respondent challenges specific findings as not supported by the evidence.

¶ 18        Respondent first challenges finding of fact 13, which states that "[t]he parents failed to properly supervise their child" and "the parents['] excessive and continued usage of controlled substances contributed to their lack of proper care and supervision of the child." Respondent contends the finding is not supported by clear and convincing evidence to the extent it indicates he was responsible in any way for Robert's removal and adjudication. Relying on a finding in the first review order that "[Robert] was initially removed due to the actions of his mother," a finding which was subsequently repeated in succeeding permanency-planning orders, respondent places the blame for Robert's removal solely on the mother. However, record evidence supports the trial court's finding that both parents contributed to Robert's removal and subsequent adjudication. The DSS social worker testified at the termination hearing about DSS's intervention with the family in May 2018 when DSS received a CPS report alleging improper supervision, injurious environment, and substance abuse after three-year-old Robert wandered from the home alone while respondent was asleep. The social worker's testimony indicated substance abuse concerns for both parents. DSS substantiated the report and began offering in-home services in June 2018, but efforts to engage the family to ensure Robert's safety were

unsuccessful. Respondent acknowledges the social worker's testimony but discounts it on grounds that the record does not indicate the social worker was involved in Robert's removal, and that the social worker testified she could not remember if she attended the adjudication hearing. Nonetheless, the social worker testified that she had followed the case "[s]ince August of 2018," and the 25 September 2018 adjudication and disposition order was also introduced into evidence at the termination hearing without objection. In that order, the court found the "activities of the parents and/or conditions in the home of the parents [that] led to or contributed to the adjudication, and led to the [c]ourt's decision to remove custody from the parents," included: a CPS report that was accepted for improper supervision, injurious environment, and substance abuse on 14 May 2018 after Robert left the house while respondent was sleeping and a neighbor called 911; respondent's admission that household members had a history of cocaine use; respondent's positive test for prescribed and unprescribed controlled substances on 15 May 2018 and his admission to use exceeding the prescribed amount of his medications; and, after a second CPS report was accepted on 27 August 2018 following the mother's being charged with a DWI while Robert was in the car, a DSS home visit on 28 August 2018 which found the home to be in disarray. The record evidence supports finding of fact 13.

¶ 19    Respondent also challenges the trial court's findings that he did not participate

in services offered by DSS. Specifically, he challenges finding of fact 34, that the social worker offered services to help him achieve the goals of his case plan, and findings of fact 23 through 25, that he did not avail himself of the services offered and was unwilling to work with DSS. He also challenges the trial court's more specific findings in finding of fact 29 that he did not consistently take steps to become clean and sober and in finding of fact 30 that he did not consistently take steps to become and remain employed, and that he declined services as late as 2 December 2019 as stated in finding of fact 36.[3]

¶ 20       In unchallenged finding of fact 33, the trial court found that "DSS entered into a case plan with the parents, showing steps necessary for them to recover custody of their child." A report on the case plan and the parents' compliance and progress throughout the case was admitted into evidence at the termination hearing without objection, and the social worker offered testimony about the case plan and the parents' progress. The evidence shows the case plan included categories specifying steps the parents should take to address housing, employment, substance abuse, emotional and mental health, and parenting skills, with an additional requirement that respondent follow up with medical care for sleep issues. Respondent acknowledges DSS offered some services, but he contends that the reunification

---

[3] Respondent identifies the challenged finding as finding of fact 35; however, finding of fact 35 concerns the mother's choosing to decline services. Finding of fact 36 addresses respondent's choosing to decline services.

services were not significant, that there were few details in the evidence about the services offered and his ability to participate in the services, and that DSS made minimal efforts towards reunification. He asserts finding of fact 34 is not supported by the evidence. We are unpersuaded by respondent's arguments.

¶ 21        We first note that respondent has not specifically challenged finding of fact 14, which also found that "DSS offered services to [the parents] to work towards recovering custody of their child." This finding is therefore binding on appeal. *See In re Z.L.W.*, 372 N.C. at 437. Nonetheless, a review of the evidence shows that the case plan was developed in September 2018 and that DSS: (1) initially made referrals for comprehensive substance abuse treatment and a "Parents As Teachers" (PAT) program to address parenting skills; (2) requested random drug screens; and (3) established supervised visits between the parents and Robert. The case plan progress report indicates that DSS later provided the parents with a housing list to assist in their housing search. The evidence further shows that DSS staff met with the parents approximately every three months to review the case plan and to address additional concerns with the parents, which included their need for counseling, changes to their work schedules, and a plan of care for Robert. The social worker testified that she worked with the parents and local daycares to try to ameliorate problems with the parents' work schedules which impeded their ability to provide all necessary care for Robert, but no resolution was achieved. The evidence also indicates

that after respondent did not address his continued sleep issues at a medical appointment, the social worker contacted the respondent's doctor to get a neurology referral for a sleep study. The record evidence supports finding of fact 34 that services were offered to the respondent.

¶ 22        As to findings of fact 23 through 25 regarding respondent's engagement with services and DSS, respondent argues he was willing to work towards reunification and did work towards reunification. He emphasizes evidence of his efforts early in the case but also acknowledges evidence of his waning participation later on. Nevertheless, he contends the evidence does not support "the broad, conclusory finding that [he] would not work with DSS." Respondent accurately recounts the evidence. Notably, the social worker testified that both parents got off to a good start and made great progress in 2019, but that things took a turn for the worse between October and December of 2019.

¶ 23        Evidence was presented that respondent completed mental health and substance abuse assessments, which recommended individual therapy, group therapy, and a psychiatric appointment for possible medication management. In the case plan progress report for December 2018, DSS reported that respondent was scheduled to begin group therapy, have a psychiatric evaluation, and start the PAT program. By March 2019, DSS reported respondent was employed and would be working full-time in April; in addition, he was looking for housing, attending

medication management, and visiting with Robert, although issues with tardiness for visits were reported. Respondent was directed to follow up with individual therapy. By June 2019, the parents had made a down payment on a place to live and were to move in by the end of the month, and DSS reported no recent concerns with substance abuse. The case plan progress report indicated respondent was participating in medication management and the PAT program. Respondent's progress appeared to continue through September 2019, but DSS reported the parents were consistently late for visits and respondent failed to disclose his continued sleep issues to his doctor. The social worker testified that she completed a home visit and determined the parents' trailer was appropriate and had space for Robert, but that the parents lost the trailer by the end of 2019. DSS reported that by December 2019, the parents were not involved in substance abuse treatment or services for emotional and mental health, were no longer in the PAT program, and were consistently late for visits, and respondent had not followed up on his medical issues.

¶ 24 The record shows that the primary permanent plan for Robert was changed to adoption in December 2019. Since that time, DSS reported missed visits and respondent's failure to engage at visits. Evidence showed that the parents were no-shows for a requested drug screen on 3 June 2020 and that DSS reported no contact with the parents in the periods between DSS's reviews of the case plan in March, June, and September 2020. The social worker testified respondent cancelled his first

neurology appointment but later reported that he had a video appointment; however, the social worker had been unable to verify this information. The social worker also testified regarding the circumstances as of the last permanency planning hearing in October 2020, approximately one month before the termination hearing. She stated the parents made minimal progress during the review period. She testified the parents had not established a residence for Robert to return to and had last reported to be living apart. She also testified that unemployment was reported in October 2020, and the parents had not been consistent with visitation at DSS. A visitation log introduced into evidence showed that the parents did not respond to DSS's attempts to schedule visits in July and August 2020. The social worker was unaware of further substance abuse treatment or emotional and mental health treatment by respondent in the months leading up to the termination hearing because he had not reported any treatment in the past year. She testified the parents had not been keeping in regular contact with DSS, explaining that "sometimes their voicemail is not set up and you can't leave a message," or "[w]e may leave a message and may not hear back from them." The social worker testified that the needs and problems that existed at the initiation of the case still existed for respondent.

¶ 25 Based on the above, we agree with respondent that the evidence does not support finding of fact 23 that he "has not availed himself of any services." We thus disregard that finding. *See In re L.H.*, 378 N.C. 625, 2021-NCSC-110, ¶ 14 (citing *In*

*re J.M.*, 373 N.C. 352, 358 (2020) (disregarding factual findings not supported by the evidence)). But the evidence of respondent's waning engagement and progress since late 2019 and his lack of contact with DSS throughout 2020 supports findings of fact 24 and 25 that respondent "has not fully utilized the services offered" and "has not been willing to work with the DSS social workers."

¶ 26        In regards to the trial court's more specific findings, respondent contends that the trial court's finding of fact 29 that he has not consistently taken steps to become clean and sober is "mostly irrelevant and not supported" because he was prescribed medication for ADHD and his positive drug screens for amphetamines were thus not indicative of substance abuse, and because his positive screens for unprescribed opioids and marijuana occurred more than two years before the termination hearing. However, as detailed above, the record evidence indicates concerns with respondent's use of controlled substances, including his excessive use of prescribed medications, that contributed to Robert's removal and adjudication as a neglected juvenile. Substance abuse was recognized as a concern from the initiation of the case and was addressed in respondent's case plan. Although the evidence shows respondent initially participated in some treatment for medication management, the evidence was that he had not reported any treatment in the year preceding the termination hearing and was a "no-show" for the most recent requested drug screen. Finding of fact 29 is supported by the record evidence.

¶ 27 Respondent also challenges finding of fact 36 that he "declined services as late as December 2, 2019."[4] This date corresponds with the December 2019 permanency-planning hearing, after which the trial court changed the primary permanent plan for Robert to adoption. Evidence presented at the termination hearing indicated that respondent was not in substance abuse treatment or participating in services for emotional and mental health issues in December 2019, and that he had not followed up with his medical issues. Respondent also did not attend DSS's quarterly case plan update as he had done on prior occasions. This evidence shows respondent was not engaged in his case plan in December 2019; however, it does not show that respondent refused any specific offer of services in December 2019. To the extent the trial court found respondent "declined" services in December 2019, we agree with respondent that the finding is not supported by the evidence and thus disregard the finding. *See In re L.H.*, ¶ 14.

¶ 28 Lastly, respondent challenges the portions of findings of fact 32 and 55 stating that "the parents have not attempted to create a bond between themselves and [Robert] since [Robert] came into foster care" and "[Robert] has absolutely no bond at

---

[4] Respondent identifies the challenged finding as finding of fact 35; however, finding of fact 35 concerns the mother's choosing to decline services. Finding of fact 36 addresses respondent's choosing to decline services.

all between himself and his parents."[5] We agree with respondent that the findings are not supported by the evidence. The evidence tended to show that DSS facilitated visits to maintain the bond between Robert and the parents. Although concerns were reported regarding the parents' repeated tardiness for visits and respondent's lack of engagement and tendency to fall asleep during visits, the evidence was that the parents consistently attended weekly visits in 2018 and 2019 and attended monthly visits in January and February 2020 before in-person visitation was suspended for several months because of the COVID-19 pandemic. Evidence was presented that the parents attended one additional visit with Robert at DSS in June 2020 but then failed to respond to attempts to schedule visits in July and August 2020. In addition to visits at DSS, the social worker testified that the parents had a relationship with the foster parents, which allowed them to have "visit[s] outside of the agency" and to participate in telephone and video calls with Robert. The social worker was unsure how many visits had taken place outside DSS's supervision, but she explained that the parents would see the foster parents and Robert when the parents attended church pre-pandemic, and the parents would communicate with the foster parents about Robert. The social worker testified that the parents have consistently visited with Robert

---

[5] Finding of fact 55 appears to be included among the findings made by the trial court to support its best-interests determination in the dispositional stage. Thus, it is binding if supported by competent evidence. *See In re C.B.*, 375 N.C. 556, 560 (2020) ("We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence." (quoting *In re J.J.B.*, 374 N.C. 787, 793 (2020))).

through the foster family, noting that she was aware that the parents visited with Robert and the foster parents the week before the termination hearing to celebrate Robert's birthday. Furthermore, although there is no testimony specifically concerning the bond between respondent and Robert, contrary to finding of fact 55 that there was "absolutely no bond at all between [Robert] and his parents," the social worker testified a bond existed "between the child and mom." We hold the evidence does not support the challenged portions of findings of fact 32 and 55. Therefore, we disregard those challenged portions. *See In re L.H.*, ¶ 14.

¶ 29        Having reviewed respondent's challenges to the trial court's findings of fact, we next consider the trial court's adjudication of grounds for termination.

### 2. Neglect

¶ 30        A trial court may terminate parental rights for neglect if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

> As we have recently explained: "Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such

> future neglect is likely, the district court must consider
> evidence of changed circumstances occurring between the
> period of past neglect and the time of the termination
> hearing."

*In re L.H.*, ¶ 10 (quoting *In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up)); *see also In re Ballard*, 311 N.C. 708, 715 (1984) ("[E]vidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect."). This Court has held that "[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)).

¶ 31 Here the trial court determined in finding of fact 41 that grounds existed to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) "as the child is a neglected juvenile and there is a probability of [sic] neglect will continue for the forseeable [sic] future . . . because the father has not addressed the issues that brought the child into care." The trial court additionally concluded that respondent had neglected Robert, and that the neglect was likely to continue in the future.

¶ 32 Respondent argues that the evidence and the findings of fact do not support the trial court's determination that there was a likelihood of repetition of neglect. His argument is largely based on his assertion that he was not responsible for Robert's

removal and prior adjudication as a neglected juvenile, which we have rejected, and his challenges to the findings of fact.

¶ 33 The record evidence and the trial court's findings which are supported by the evidence in this case establish that Robert was removed from the home and adjudicated neglected based on both parents' failure to properly supervise and provide proper care to Robert, which was related to the parents' abuse of controlled substances. DSS developed a case plan with respondent that identified matters he needed to address to regain custody of Robert, including issues related substance abuse, employment, parenting skills, mental health, housing, and medical care for sleep problems, and DSS offered services to respondent. However, respondent only partially cooperated with services and with DSS. As a result, the conditions that existed when Robert was removed from the home and contributed to Robert's adjudication as a neglected juvenile continued to exist at the time of the termination hearing. We hold that the evidence and the findings that respondent failed to correct the issues that contributed to Robert's prior adjudication as a neglected juvenile support the trial court's determination that there was a likelihood of repetition of neglect. Accordingly, the trial court did not err in adjudicating neglect as a ground for termination of respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 34 Because "an adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental right," *In re E.H.P.*, 372 N.C. at 395

(citing *In re Moore*, 306 N.C. at 404), we need not address respondent's challenge to the trial court's adjudication of grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(2).

**B. Disposition**

If the trial court determines that at least one ground exists to terminate parental rights under N.C.G.S. § 7B-1111(a), "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. at 842 (first citing *In re Young*, 346 N.C. 244, 247 (1997); and then citing N.C.G.S. § 7B-1110). In determining whether termination of parental rights is in the juvenile's best interests,

> the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).

¶ 36  "The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6 (2019) (citing *In re D.L.W.* 368 N.C. at 842). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

¶ 37  In this case, the trial court issued findings regarding each of the relevant criteria. The court found that at the time of the termination proceeding, Robert was five years old and had been in foster care for twenty-five months; that the likelihood of Robert's adoption was great, as Robert's foster parents planned to file an adoption proceeding as soon as he is legally free for adoption; that the permanent plan for Robert was adoption, and termination of parental rights was the last impediment in the accomplishment of the permanent plan; that any bond between Robert and respondent was not significant;[6] that the foster parents were very involved with Robert, and the bond between Robert and the foster parents was very strong; and that the foster parents had sufficient means to care for Robert. Respondent does not challenge any of these findings, and these findings are thus binding on appeal. *See In re A.K.O.*, 375 N.C. 698, 702 (2020) ("Dispositional findings not challenged by

---

[6] We do not consider the challenged portion of finding of fact 55 that there is absolutely no bond between Robert and the parents because we have determined that portion of the finding is not supported by the evidence.

respondents are binding on appeal." (citing *In re Z.L.W.*, 372 N.C. at 437)).

¶ 38        Respondent instead contends the trial court abused its discretion in making its best-interests determination because the court "misapprehended two key points of law." Neither argument directly addresses the trial court's written findings or its consideration of the findings in support of its best-interests determination.

¶ 39        Respondent first argues the trial court erred when it set adoption as a concurrent permanent plan for Robert in the 3 February 2020 order from the 2 December 2019 permanency-planning hearing. Respondent directs this Court's attention to the trial court's finding in the permanency-planning review order that "[g]uardianship would not be an appropriate plan, as there are no identified relatives to fill that need," and he argues the trial court misapprehended the law because it is not necessary that a guardian be a relative. *See* N.C.G.S. § 7B-600(b) (2019) (contemplating the "appointment of a relative or other suitable person as guardian"). Respondent contends guardianship would have been the "ideal situation" in this case.

¶ 40        Although respondent notes that there was no right of appeal from the order changing Robert's permanent plan, *see* N.C.G.S. § 7B-1001(a1) (2019), he argues the issue is properly before this Court pursuant to N.C.G.S. § 1-278 because the trial court had to consider Robert's permanent plan in finding that termination of parental rights would aid in accomplishing the permanent plan. *See* N.C.G.S. § 1-278 (2019) ("Upon an appeal from a judgment, the court may review any intermediate order

involving the merits and necessarily affecting the judgment."). But the courts have long required a timely objection when review of an intermediate order is later sought pursuant to N.C.G.S. § 1-278. *See Tinajero v. Balfour Beatty Infrastructure, Inc.*, 233 N.C. App. 748, 757 (2014) (citing *Brooks v. Wal-Mart Stores, Inc.*, 139 N.C. App. 637, 641–42 (2000)). The record in this case contains no indication that respondent previously objected to, or contested, the trial court's exclusion of guardianship as a permanent plan for Robert based on any alleged misapprehension of the law. The challenged finding was initially made months before the termination hearing, and similar findings were repeated in subsequent permanency-planning orders. Therefore, we do not consider respondent's collateral attack on the permanency-planning order.

¶ 41        Moreover, we note that this Court has rejected arguments regarding the consideration of dispositional alternatives at this stage of a termination proceeding. *See In re Z.L.W.*, 372 N.C. at 438 (rejecting a parent's argument that the trial court should have considered dispositional alternatives, such as granting guardianship or custody to the foster family, in order to leave a legal avenue for the children to maintain a relationship with the parent). Although the trial court may consider alternative dispositions, *see In re S.D.C.*, 373 N.C. 285, 290 (2020) (explaining that the trial court "may treat the availability of a relative placement as a 'relevant consideration' [under N.C.G.S. § 7B-1110(a)(6)] in determining whether termination

of a parent's parental rights is in the child's best interests"), it is not required to do so.

> While the stated policy of the Juvenile Code is to prevent the unnecessary or inappropriate separation of juveniles from their parents, we note that the best interests of the juvenile are of paramount consideration by the court and when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time.

*In re Z.L.W.*, 372 N.C. at 438 (cleaned up). Accordingly, when it is clear from the termination order that the trial court considered the relevant dispositional criteria, made proper findings, and made a reasoned determination that termination of parental rights was in the juvenile's best interest, as the trial court did in the instant case, an appellate court should not second-guess the trial court's best-interests determination.

¶ 42    Lastly, respondent argues the trial court misapprehended the legal effect of termination of parental rights when it stated

> Furthermore, I'm going to make a finding that this termination serves a dual purpose of looking after the best interest of the minor child by being in a more stable environment while, at the same time, allowing him to keep contact with his biological parents, which is not something that we see every day.

Because "[a]n order terminating the parental rights completely and permanently terminates all rights and obligations of the parent to the juvenile and of the juvenile to the parent arising from the parental relationship," N.C.G.S. § 7B-1112 (2019),

respondent contends the court's statement amounts to a misapprehension of the law and an abuse of discretion in the best-interests determination.

¶ 43    Despite the trial court's statement at the termination hearing, the court made no such finding in the termination order. As detailed above, the trial court made findings on the relevant criteria in N.C.G.S. § 7B-1110(a) in support of its determination that termination of parental rights was in Robert's best interests. Additionally, we do not believe the court's statement amounts to a misapprehension of the law. There was no indication that the trial court misunderstood the legal effect of termination of parental rights. The court's statement instead specifically acknowledges the unique circumstances in this case, in which the foster father, who was also the prospective adoptive father, testified to the family's openness to facilitating an ongoing connection between Robert and his biological parents, unless it was unsafe to do so. We understand the court's statement to be that termination of parental rights was in Robert's best interests, but that termination in this case did not necessarily foreclose the possibility that Robert would keep in contact with his biological parents given the foster parents' values. Accordingly, we reject respondent's argument that the trial court misapprehended the legal effect of terminating his parental rights.

¶ 44    A review of the termination order shows that the trial court considered the relevant dispositional criteria in N.C.G.S. § 7B-1110(a) and made a reasoned

determination based on those criteria that termination of respondent's parental rights in Robert was in Robert's best interests. Because the trial court did not abuse its discretion, we uphold the trial court's best-interests determination.

## III.    Conclusion

¶ 45    The trial court did not err in adjudicating neglect as a ground for termination pursuant to N.C.G.S. § 7B-1111(a)(1) and did not abuse its discretion in determining that termination of respondent's parental rights was in Robert's best interests. Therefore, we affirm the trial court's termination order.

AFFIRMED.